**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
                                       )
**PENELOPE MINTER,**                   )
                                       )
            Plaintiff,                 )
                                       )
        v.                             )        Civil Action No. 10-0516 (CRC)
                                       )
**THE DISTRICT OF COLUMBIA,**          )
                                       )
            Defendant.                 )
_____ )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Penelope Minter, a longtime employee of the District of Columbia Government, contends that the District did not provide reasonable accommodation for her disability in the form of a flexible work schedule or permission to work from home one to two days per week, and ultimately fired her for requesting these accommodations. The District moves for summary judgment, arguing that Minter's claims were not timely filed, Minter is not a qualified individual with a disability under the relevant statutes, and Minter has not produced sufficient evidence for a reasonable jury to find that the non-discriminatory reason provided to justify the termination was not the actual reason. Because the District successfully demonstrates that Minter did not file her claims within the prescribed time limits, is not a qualified individual with a disability under the relevant laws, and has not provided sufficient evidence that the District's reasons for firing her were pretextual, the Court will grant its motion for summary judgment.

## I.    Background

Because the timeliness of Minter's claims is so central to this case, the Court will provide a detailed review of the chronology of events underpinning this litigation.

For approximately 19 years, Minter was employed as a social worker by various agencies of the government of the District of Columbia. Am. Compl. ¶ 9. According to her Complaint, Minter suffers from sarcoidosis, rheumatoid arthritis, and fibromyalgia. Id. ¶ 10; see Pl.'s Opp'n, Ex. 5 at 5–6.[1] She describes sarcoidosis and rheumatoid arthritis as "chronic, systemic inflammatory diseases that cause pain in the joints, lungs, lymph nodes and other tissue." Am. Compl. ¶ 10. Fibromyalgia, she alleges, is "a medical disorder characterized by chronic widespread pain, debilitating fatigue, sleep disturbance and joint stiffness." Id. Minter's alleged physical impairments "substantially limit[] the major life activity of working," such that she deems herself a person with a disability for purposes of the Americans with Disabilities Act ("ADA"), see 42 U.S.C. § 12101 et seq.[2] Am. Compl. ¶ 5. These impairments also limit her ability to sit, stand and walk. Minter Dep. 11/13/12 at 190:2.[3]

Over the years, plaintiff held positions in the District's Child and Youth Services Administration, the D.C. Mayor's Youth Initiative Office, the Office of the Commissioner of Social Services, the Youth Services Administration ("YSA"), and the Office of the Chief Medical Examiner ("OCME"). See generally Pl.'s Opp'n, Ex. 6 at 9–12.[4] In at least some of these positions, she had been allowed to move between a full time schedule and a reduced work schedule – typically a 32-hour work week – when she deemed it necessary. See Minter Dep.

---

[1] Exhibit 5 to plaintiff's opposition is filed under seal.

[2] The Court notes at the outset that plaintiff points to evidence as to her diagnoses and her physical symptoms (such as pain, fatigue, and limited mobility) but does not provide deposition testimony or any other evidence to link her diagnoses and symptoms to her ability or inability to perform her duties, or how the accommodations she requested address or otherwise alleviate her symptoms.

[3] Plaintiff was deposed on three days: September 18, 2012, November 13, 2012, and June 11, 2013. Both parties have attached excerpts from plaintiff's deposition transcript to their respective submissions. The Court will refer to the transcripts as "Minter Dep. 9/18/12," "Minter Dep. 11/13/12," and "Minter Dep. 6/11/13."

[4] Exhibit 6 to plaintiff's opposition is filed under seal.

9/18/12 at 26:14–27:14, 28:17–20.  For example, between 1988 and 1995, although plaintiff's typical work hours were from 10:00 a.m. to 6:30 p.m., see id. at 26:14–18, she was allowed to "work a reduced schedule," id. at 27:2–3, and "when [she] was ready to [go] back to full time," id. at 27:4–5, she could do so without incident because she "remained in [a] full-time position," id. at 27:6.  At one point, an administrative officer "would literally do a personnel action to reduce [her] schedule and then a personnel action to bring it back to full time."  Id. at 28:17–19. In another position, beginning in 1995, id. at 32:7–8, plaintiff "had flexibility," although she could not recall whether she was allowed to shift between a full time schedule and a reduced work schedule, id. at 33:9.  She could work late and leave for medical appointments as necessary without any objection from her supervisors, see id. at 33:11–17.

While working at the the Office of the Commissioner of Social Services beginning in 1996, see id. at 35:9–20, Minter 's work hours still were from 10:00 a.m. to 6:30 p.m., see id. at 37:4–6, but when she "asked to go on a reduced work schedule," she claims "they shipped [her] off to another office," id. at 37:9–10.  At that point, plaintiff was told "to report to YSA, the Youth Services Administration."  Id. at 38:3–4.  According to plaintiff, "they booted [her] out and sent [her] to [YSA] because [she] asked for accommodation."  Id. at 38:12–14.  At YSA, plaintiff reached an agreement with her supervisors to work a reduced schedule, typically taking a day off in the middle of the week or when she scheduled medical appointments.  See id. at 48:12–22, 49:17–50:18.

Minter was "detailed" to the OCME on two occasions, first in 1999, see Minter Dep. 9/18/12 at 67:20–68:1, and again in November 2001 as a Program Specialist, id. at 76:14–17;

Am. Compl. ¶ 12.[5]  Her reduced schedule continued, see Minter Dep. 9/18/12 at 67:14–68:1,

77:6–16, notwithstanding her "attempt[s] to go back to full time," id. at 77:8.  According to

Minter, "all the players had changed [and] nobody would listen to [her] or respond," id. at 78:3–

5.  Working on a reduced schedule meant that plaintiff lost pay and retirement benefits, Minter

Dep. 11/13/12 at 198:11–19, which "be[came] problematic as [she was] getting older," id. at

198:19–20; see Minter Dep. 9/18/12 at 78:8–13.  It was Minter's understanding that "the ADA

does not require [that she work] reduced schedules in an accommodation because [she was]

losing pay [and] benefits."  Minter Dep. 11/13/12 at 192:7–10, 198:21–199:3.

On May 1, 2006, Minter accepted a promotion to the full-time position of Secretariat

("Coordinator") to the Child Fatality Review Committee ("CFRC").  Def.'s Mot. for Summ. J.,

Ex. B (Letter to plaintiff from W.L. Stokes, SR, HRS, dated April 7, 2006 and Acceptance[] of

Offer of Management Supervisory Service Appointment).  "The mission of the [CFRC was] to

examine the circumstances surrounding and leading to child deaths for the purpose of identifying

contributing factors and making recommendations for systemic change, in order to improve

service delivery to children, and possibly to reduce the number of preventable deaths, especially

those associated with child abuse and neglect."  Id., Ex. C (position description for Secretariat to

the Committee) at 1.  This was a Management Supervisory Service position; Minter "[did] not

acquire permanent status, serve[d] at the pleasure of the appointing personnel authority, and

[could] be terminated at any time."  Id., Ex. B at 1.  Among other duties, the Coordinator

managed the day-to-day functions of the CFRC, supervised and trained CFRC staff, developed

grant applications, selected and assigned cases for review, developed reports from case reviews,

---

[5]   During plaintiff's "detail" to OCME, the District's Department of Human Services paid her,
and continued to do so until she was hired by OCME on a full-time basis.  See Am. Compl. ¶ 12
n.1.

4

and attended review team meetings.  See id., Ex. C at 2.  Sharan James, OCME's Fatality Coordinator, was Minter's immediate supervisor.  Minter Dep. 9/18/12 at 190:17, 196:11–12. Dr. Marie-Lydie Y. Pierre-Louis was the District's Chief Medical Examiner at that time, and Beverly Fields was her Chief of Staff.  See Minter Dep. 11/13/12 at 197:3–6; Def.'s Mot. for Summ. J., Ex. E at 3.

James, with whom Minter had been acquainted since 1995, see Minter Dep.  9/18/12 at 57:3–13, knew that plaintiff had sarcoidosis and that plaintiff had arranged a reduced work schedule before her detail to OCME began.  See James Dep. at 29: 3–21, 52:7–19.  In her capacity as Minter's immediate supervisor, she had a number of conversations with Minter about her purported disability, both before plaintiff accepted the Coordinator position, Minter Dep. 11/13/12 at 190:10–22, and "after starting the job, [when] the discussions started again around June or July of 2006," id. at 191:1–3.  Among the topics of those discussions were "the possibility of working from home at times," id. at 191:16–17, and "reduced schedules," id. at 191:19; see id. at 192:11–193:2.  Minter recalled a "positive conversation about those two options as possibilities," id. at 193:1–2, and believed that James thought these options "reasonable," id. at 192:19.

James apparently "was not comfortable" with Minter working from home, id. at 197:12–198:1, because "she was concerned about security issues," id. at 200:7, regarding "confidential records," James Dep. at 69:18.  Based on Minter's understanding that "the only thing [James was] comfortable with [was] a reduced schedule," Minter Dep. 11/13/12 at 206:2–3, Minter decided to "go ahead and do this for now and then . . . look at [her] other options later and change to something else because [she did not] want to keep losing benefits," id. at 206:5–8.

It was not clear, however, whether James had authority to approve either option.  According to

Minter, James "neither told [Minter] she didn't have the ability [to personally implement an

accommodation], nor did she tell [Minter] she didn't.  But [James] agreed that it was something

[they] could negotiate, something [they] could talk about[.]"  Id. at 193:13–16.  Notwithstanding

the reduced work schedules Minter enjoyed while employed at other District offices, she "really

had no accommodation after she got the job at OCME."  James Dep. at 53:15–16.  Rather, she

was "back on her five-day work week schedule . . . ."  Id. at 53:17–18.  James "was pushing her

to put in for the accommodation," id. at 53:20–21, and urged Minter "to talk with the ADA

coordinator, id. at 53:21–54:1.  James intended to support Minter's request for an

accommodation, id. at 54:10–12, and apparently was under the impression that Minter likely

would have had to "to submit extensive documentation related to medical records . . . to the

ADA person."  Id. at 54:6–8.  OCME's "ADA person" was Sharlene Williams, James Dep. at

54:13–14; Minter Dep. 6/11/13 at 8:19–20, whom Minter believed "would formalize" her

accommodation.  Minter Dep. 11/13/12 at 213:22.  The referral by James to Williams took place

"sometime around September" 2006.  Id. at 202:10.

   Tanya Lumpkins, M.D., who had been treating Minter's sarcoidosis, Minter Dep.

11/13/12 at 260:8–10, prepared a letter addressed "to whom it may concern," Minter Dep.

6/11/13 at 7:5, which Minter intended to give to James, id. at 9:9–10, "in anticipation that [she]

may need to go on a reduced schedule," id. at 7:22–8:2.  The letter, dated July 12, 2006, id. at

7:2–4, stated that Minter "[was] able, . . . may work a 40-hour workweek," but could not

"maintain such a schedule on a regular basis."[6]  Id. at 14:4–6.  In other words, as of July 12,

2006, although Minter was working a 40-hour work week on a regular basis, this schedule was

---

[6]   Neither party included Dr. Lumpkins' letter as an exhibit, and its full contents are unknown.

not sustainable in Dr. Lumpkins' opinion.  See id. at 14:9–16:10.  Minter did not recall whether

she gave Dr. Lumpkins' letter to James or Williams.  See id. at 8:13–9:16, 10:17, 13:9–15.

Initially, Minter "told [Williams] about the conversations [Minter] had with Ms. James . .

. about doing a reduced schedule."  Minter Dep. 11/13/12 at 211:1–4.  Minter testified that

Williams' response was that there were not "any part-time positions at OCME, and part time

[was] not a reasonable accommodation."  Id. at 211:6–8.  Williams was "to look into some things

and  . . . come back and talk again."  Id. at 212:2–3.  Meanwhile, Minter contacted other District

government offices in search of assistance, to no avail.  See generally id. at 212:5–218:6.

On September 25, 2006, Minter "slipped on the wet, newly-waxed hallway floor in the

OCME building," Am. Compl. ¶ 32, injuring "her back [and] her left knee, and aggravate[ing]

her prior left ankle and foot injury," id., sustained in 2005 when she "tripped over office

equipment power cords," fell, and "injured her left ankle and foot."  Id. ¶ 19; see Def.'s Mot. for

Summ. J., Ex. D (Letter to plaintiff from Sharan D. James dated April 5, 2007) at 1; Minter Dep.

11/13/12 at 138:11–19.  Minter described the injury to "the whole side from [her] left side to

[her] foot," Minter Dep. 11/13/12 at 138:14, as "a sciatic nerve injury on both sides, but one is

much more involved than the other," id. at 138:17–19.  She sought and obtained disability

compensation, presumably worker's compensation benefits, following this injury.  Def.'s Mot.

for Summ. J., Ex. D at 1.  Minter stated that the injuries she sustained on September 25, 2006

made the fatigue and difficulty sitting, standing, and walking as a result of her sarcoidosis "much

more intense," to the point that even lifting records from a file cabinet caus[ed] a lot of pain for

[her] back."  Minter Dep. 11/13/12 at 190:2–9; 20: 3–9.

Minter's conversations with Williams continued after her workplace injury, id. at

203:12–13, as Minter recalled having "asked [Williams] about the injury as an additional

component of the accommodation," id. at 203:13–15. Neither James nor Williams was inclined to address an accommodation for plaintiff's alleged disability together with her workplace injury (and resulting worker's compensation claim). Id. at 221:4–11; James Dep. at 60:14–61:4. According to Minter, Williams told her that the "accommodation for Workers' Comp is not related to [her] other accommodation," Minter Dep. 11/13/12 at 221:8–9, and Williams thereafter "refused to even discuss" the worker's compensation claim, id. at 221:11. Minter "didn't even know how to separate the two, because . . . it's the same issue for [her]." Id. at 221:12–14. James believed that Minter's "illness or whatever was requiring her to be away from the office increasingly more was related to the Workmen's Comp, her fall, not her ADA issues." James Dep. at 61:1–4.

From Minter's perspective, her conversations with Williams were not fruitful. When plaintiff inquired about a reduced schedule, "which would have meant working less than 40 hours per week," Minter Dep. 11/13/12 at 220:7–8, Williams maintained that there were not "any part-time positions at OCME, and part time [was] not a reasonable accommodation." Id. at 211:6–7; see id. at 218:10–11.[7] Further, according to Minter, Williams questioned whether plaintiff "even ha[d] an illness," id. at 219:16, and directed Minter to "bring . . . all [her] medical records," in order for Williams to "decide whether [Minter had] a disability," id. at 219:16–17. They had reached "an impasse" without coming to any agreement about an accommodation. Id. at 247:5. If Minter was not "fit for duty," Williams allegedly told her that she should "file for disability." Id. at 219:12–13; see id. at 255:19–21.

On December 1, 2006, Williams sent an email to Minter encouraging her "to keep the appointment [she] made with [Williams] for December 5, 2006 at 2:00 p.m." Def.'s Mot. for

---

[7] Williams testified that "a part-time position is not a reasonable accommodation . . . because you lose all your benefits and everything." Williams Dep. at 74:16–19.

Summ. J., Ex. H (email message to plaintiff from Sharlene Williams dated December 1, 2006).

Williams' email further stated:

> This is to follow up on our telephone conversation yesterday concerning your medical conditions and how they should be addressed.
> My advice to you is to keep the appointment you made with me for December 5, 2006 at 2:00 p.m. You are clearly having difficulty in determining where to go or how to handle your situation. Without a meeting where we can discuss your condition(s) and claims, I am unable to assist you, even as to the proper forum for addressing your claims. . . . As the ADA compliance officer, my advice is that you keep our appointment and allow me to assist you. The agency is unable to accommodate you for a condition about which you have not informed us.

Id., Ex. H. "This is the same day [Minter] went to EEOC," id. at 230:19, where she completed an Intake Questionnaire charging discrimination based on her disability, Minter Dep. 11/13/12 at 236:8–22; 246:12–13; see Def.'s Mot. for Summ. J., Ex. K (Intake Questionnaire) at 3 (page numbers designated by the Court). Minter explained that she has a disability requiring minimal accommodation, yet the District "made little progress to allow flexibility in scheduling to accommodate [her] needs for reduced hours and/or work at home (telework) without penalties." Id., Ex. K at 3. A handwritten note below her signature stated her "wish to consult with a[n] EEO specialist regarding the possible filing of charges." Id., Ex. K at 4.

Thereafter, Minter had no more "face to face [meetings] with [Williams]." Minter Dep. at 250:4–5. She did correspond with Williams by email, and again inquired whether both the worker's compensation claim and her accommodation request could be addressed together. Def.'s Mot. for Summ. J., Ex. H (email message to Williams from plaintiff dated December 4, 2006). Williams responded:

> I do not know if the two claims can be addressed together. It would depend on the status of the Workman's Comp claim. If the Workman's Comp claim is still effective and the medical recommendations for accommodation are up to date, then probably, yes. However . . . , I cannot answer that question without having knowledge of your ADA and Workman's Comp claims and your doctor(s)'

recommendations for accommodation . . . . After I learn what your claims are and what accommodations are needed, I will be better able to answer your question[.]

Id., Ex. H (email to plaintiff from Williams dated December 4, 2006).

Minter did not meet with Williams on December 5, 2006, apparently because a meeting Minter attended took longer than expected. See Pl.'s Opp'n, Ex. 8 (email from plaintiff to Williams dated December 5, 2006). Williams then sent an email to Minter in error – it was intended for James – stating, "FYI. This if for your [James'] records, in case [Minter] approaches you to complain that she cannot get any help. She did not come to our meeting as I requested." Id., Ex. 8 (email from Williams to plaintiff dated December 5, 2006). Minter expressed concern "that this [was] becoming an adversarial process," even though she had "no desire to be in a battle" with Williams. Id., Ex. 8 (email from plaintiff to Williams dated December 5, 2006. Williams responded, "I am sorry that you believe my offer to assist is adversarial. If and when you are ready, please feel free to see me." Id., Ex. 8 (email from Williams to plaintiff dated December 5, 2006).

Although Williams requested medical information and a doctor's recommendations for an accommodation, Minter did not recall whether she had actually provided this information. See Minter Dep. 11/13/12 at 251:21–256:5; 258:14–21. She claimed that "they already had [her] information," id. at 252:2–3, or rather that "information regarding the Workers' Compensation was available to [Williams] the whole time," id. at 252:8–9; see id. at 253:21–254:6. Minter contended in her deposition that Williams "wanted all [her] medical information," id. at 255:12–13, which Minter "did not provide," id. at 153:2, because she believed Williams "had no right to all [her] medical records," id. at 252:21–22.

From unspecified dates in December 2006 through January 2007, Minter took leave on the advice of a doctor, which apparently was connected to her worker's compensation claim for

injuries sustained on September 25, 2006. See Minter Dep. 11/13/12 at 140:17–20; 142:1–8; 261:8–18; 262:4–263:7. She was to continue working a 40-hour work week, id. at 261:16–21, and apparently did so through the end of February 2007, id. at 262:14–22.

By the end of February 2007, because Minter still "was having a lot of pain," id. at 263:18–19, she took additional leave with the understanding that this period would be covered through worker's compensation benefits, see id. at 264:3–14.[8] Dr. Levitt, who completed an independent medical examination of Minter in April 2007 for the purposes of her worker's compensation claim, cleared her to return to work. See id. at 264:15–265:3; 275:2–8. She chose not to return to work, however, "[b]ecause [she] wasn't getting any medical care or treatment[, and she] was still having lots of pain." Id. at 268:7–8. At that point, Minter understood that she would be using her annual and sick leave, and thereafter would take leave without pay. Id. at 268:17–269:1.

On April 5, 2007, James sent Minter a letter regarding her leave status. See generally Def.'s Mot. for Summ. J., Ex. D. Based on the medical certifications James had received, Minter had used 18 out of 21 days of leave authorized in connection with her September 25, 1006 workplace injury and resulting worker's compensation claim. Id., Ex. D at 1. Without additional documentation, James stated that Minter could not apply any leave to cover the additional days she had been absent. Id., Ex. D at 1. James asked that Minter provide "supporting medical documentation to cover the current and projected seven (7) week period of absence (February 26 through April 13, 2007)," and further requested that she complete an "Application for Leave

---

[8]  Minter declined to return to work on the verbal instruction of an unidentified claims examiner, who presumably was the individual who handled her worker's compensation matter. See Minter Dep. 11/13/12 at 263:5–264:14; 266:5–267:18.

form officially requesting any uncovered leave to be applied to Leave Without Pay." Id., Ex. D at 2.

Meanwhile, on April 18, 2007, the EEOC sent Minter a letter with "six (6) copies of the charge of discrimination," informing her that, "[i]n order for the [EEOC] to investigate [her] allegations, [she] must sign and date these documents and return them," as "[t]he law requires that charges of discrimination be filed with us within 300 days (in some cases 180 days) from the date the alleged discriminatory action occurred." Id., Ex. L (Letter from Jacqueline Queirolo, Intake Officer, Washington Field Office, EEOC, dated April 18, 2007). Minter signed the EEOC Charge of Discrimination on October 19, 2007. Id., Ex. M (Charge of Discrimination). By April 28, 2007, she had exhausted her sick leave and annual leave. Def.'s Mot. for Summ. J., Ex. E (Letter from Fields to plaintiff dated May 7, 2007) at 2. On May 7, 2007, Fields notified Minter that, "[b]ased on [her] injury and absences from the office as of September 25, 2006, [she may have qualified] for medical leave pursuant to the federal Family and Medical Leave Act ('FMLA') and District of Columbia Family and Medical Leave Act ('DCFMLA')." Id., Ex. E at 1. Fields' letter further advised Minter that, "[i]n order to determine whether [her] absence . . . qualifie[d] as medical leave, OCME require[d] that [her] healthcare provider complete [a] medical certification and return it to the OCME no later than May 22, 2007." Id., Ex. E at 2.

In late May or early June 2007, see Minter Dep. 11/13/12 at 279:4–6, Minter spoke with Fields and Williams by telephone, id. at 279:9–10, and during the call Williams allegedly told her that she could not return to OCME if she was "not fit for duty." Id. at 280:19. Minter summarized Williams' statement as follows:

> If you can't come to work, then you should just go on disability. She repeated to me OCME doesn't have any part-time positions. So you can't – because I went through the same scenario that I had had – conversations that I had with her back in the fall, and she repeated those.

Id. at 280:21–281:5.  By "disability," Minter understood Williams to mean "Social Security disability."  Id. at 281:21–22.

Because OCME had not received "the required supporting medical certification," James again requested "medical certification to for [Minter's] absence from duty since February 26, 2007."  Def.'s Mot. for Summ. J., Ex. F (Letter from to plaintiff dated June 14, 2007).  In addition, James directed Minter, by June 20, 2007, "to either report to duty or provide [OCME] with the certification needed to support [her] continued absence from duty."  Id., Ex. F.  On June 20, 2007, Am. Compl. ¶ 50, Minter sent by fax James "a doctor's statement," Minter Dep. 11/13/12 at 273:10, from neurologist Michael E. Batipps, M.D. "saying that [she] was totally and temporarily disabled from the injury," id. at 273:12–14; *see id*. at 273:19–22.[9]  While Dr. Batipps assessed that plaintiff was totally disabled for an indefinite period, Def.'s Mot. for Summ. J., Ex. G, Minter informed James that she "believed [she] could come back to work [in] September."[10]  Minter Dep. 11/13/12 at 273:17–18.

Minter then received a letter dated July 24, 2007 notifying her that her termination would become "effective at the close of business, Wednesday, August 8, 2007."  Def.'s Mot. for Summ. J., Ex. N (Letter to plaintiff dated July 24, 2007) at 1.[11]  According to Fields' deposition

---

[9]  Michael Batipps, M.D., declared Minter totally disabled for an indefinite period beginning on September 26, 2006.  Pl.'s Opp'n, Ex. G (Disability Certificate dated June 19, 2007) (filed under seal).  Although Dr. Batipps' handwritten comments are partially illegible, the report indicated that sarcoidosis was not the cause of plaintiff's disability.

[10]  Minter testified that she attached to the Disability Certificate a cover letter stating her "hope to return by the beginning of September [2007], depending on present treatment."  Pl.'s Opp'n, Pl.'s Statement of Facts at 17; *see* Minter Dep. 11/13/12 at 273:15–22.  The cover letter was not included among plaintiff's exhibits, however, and it is not part of the record on summary judgment.

[11]  The July 24, 2007 letter apparently is a two-page letter, yet only the first page (which bears no signature) is attached as an exhibit to defendant's memorandum.  See Def.'s Mot. for Summ. J., Ex. N.

testimony, Minter was terminated because, notwithstanding the agency's requests for "certification from a doctor stating, this is why [Minter was] out of the office and this is the length of time [she] will be out of the office," the agency "didn't receive anything . . . from any type of physician, or anyone for that matter, including [Minter] herself." Fields Dep. at 92:12–18. She further testified:

> Q. [Robert DeBerardinis, Assistant Attorney General, District of Columbia] And so there came a point where a decision was made that enough's enough. Would that be fair to say?
> A. [Beverly Fields, Chief of Staff to the District of Columbia's Chief Medical Examiner] Yes.
> Q. Who made that decision?
> A. I think we collectively did, the supervisor, Sharan James, I and the general counsel, Sharlene Williams. And I'm pretty sure we had talked to DCHR, and it may have been legal counsel there that Sharlene may have interacted with just to get some more advice on how to handle this situation, and it came –
> Q. When you say "handle this situation," what are you talking about?
> A. What do we do? We have to have work done. We're not getting any response from the employee for months, and the employee is not reporting to work. So, the agency has to have the work done and with all of the efforts that we made to attempt to get documentation from the employee, hear from the employee about what was going on with her, we had to make a decision to move forward so that we could get the work done.
> Q. Was there any other reason that [Minter] was terminated?
> A. No.

Id. at 93:15–94:19. The EEOC issued Minter a right-to-sue letter, which she received on December 22, 2009. Am. Compl. ¶ 56.

Minter filed this action on March 22, 2010 under the ADA, the Rehabilitation Act, see 29 U.S.C. § 791 et seq., and the District of Columbia Human Rights Act ("DCHRA"), see D.C. Code § 2-1401 et seq. See Am. Compl. ¶ 2. Specifically, she alleges that the District failed to provide her a reasonable accommodation for her disability, namely, a flexible work schedule or permission to work from home one or two days per week (Counts I and II), and discharged her in retaliation for having requested an accommodation (Count III), in violation of the ADA. She

further alleges that these same actions – failure to provide a reasonable accommodation for her disability and retaliatory discharge – violated the Rehabilitation Act (Counts IV and V). Lastly, plaintiff alleges that the above-mentioned actions and retaliation in the form of terminating her for having requested an accommodation and having filed a charge of discrimination violated the DCHRA (Count VI). She demands "back pay, injunctive relief, reinstatement of civil service status, reinstatement of all annual and sick leave, reinstatement of benefits, reinstatement of [her] employment, attorneys' fees and court costs, and such other equitable relief as the Court deems appropriate." Am. Compl. ¶ 2.

## II.      Standard of Review

The District moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R .Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents . . . affidavits or declarations, stipulations . . . , admissions, [or] interrogatory answers[, or by]  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.  56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When considering a motion for summary judgment, the Court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in her favor. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted). Yet, the mere existence of a factual dispute does not bar summary judgment. See Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on conclusory assertions without any factual basis in the record to create a genuine dispute, see Ass'n of Flight Attendants - CWA v. U.S. Dep't of Transp., 564 F.3d 462, 465–66 (D.C. Cir. 2009).

### III. Analysis

#### A. Timeliness of Plaintiff's Claims

##### i. Failure-to-Accommodate Claim Under the ADA

A plaintiff bringing an employment discrimination claim under the ADA first must file a charge of discrimination "within a specified period . . . after the alleged unlawful employment practice occurred." Hodge v. United Airlines, 666 F. Supp. 2d 14, 20 (D.D.C. 2009) (quoting Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 623–24 (2007)); see also Marshall v. Fed. Express Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997) ("Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving the agency a chance to act on it.").[12] Ordinarily, a plaintiff must file her charge of discrimination "within one hundred and eighty days after the alleged

---

[12] Procedures applicable to Title VII of the 1964 Civil Rights Act, as amended, see 42 U.S.C. § 2000e et seq., including the limitations period set forth in 42 U.S.C. § 2000e-5, apply to actions brought under the ADA, see 42 U.S.C. § 12117(a).

unlawful employment practice occurred . . . , except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e-5(e)(1). Because the District's Office of Human Rights ("DCOHR") has a work sharing agreement with the EEOC, a claim filed with one agency is deemed to have been cross-filed with the other. See, e.g., Lee v. District of Columbia, 733 F. Supp. 2d 156, 161 (D.D.C. 2010); Kornegay v. AT&T, 579 F. Supp. 2d 34, 37 (D.D.C. 2008); see also Schuler v. Pricewaterhouse Coopers, LLP, 514 F. 3d 1365, 1372 (D.C. Cir. 2008) (analyzing "the worksharing agreement, which the EEOC, acting in accordance with 29 C.F.R. § 1626.10, has signed with the DCOHR"). In the District of Columbia, then, a plaintiff enjoys a longer period – 300 days – within which to file a charge of discrimination. See Lee, 733 F. Supp. 2d at 160; Tucker v. Howard Univ. Hosp., No. 10-cv-756, 2011 WL 52863, at *3 (D.D.C. Jan. 7, 2011) ("In the District of Columbia, an EEOC charge must be filed within 300 days of the date of the alleged discrimination."). "[I]f the employee does not submit a timely EEOC charge, [she] may not challenge that practice in court." Ledbetter, 550 U.S. at 624 (citing 42 U.S.C. § 2000e-5(f)(1)).

In Counts I and II of the Amended Complaint, Minter alleges that the District failed to provide her reasonable accommodation for her disability, namely, a reduced schedule or permission to work from home one or two days per week, in violation of the ADA. See generally Am. Comp. ¶¶ 61–69, 71–76. The District argues that plaintiff's ADA claim was not timely filed. See generally Def.'s Mot. for Summ. J. at 20–23. It asserts that the latest date on which her claim could have ripened is December 5, 2006, see id. at 22, when Williams "repeated that part-time is not a reasonable accommodation[,]" Am. Compl. ¶ 40, after which Minter had no further discussions regarding her request for an accommodation. Assuming that the 300-day

limitations period began to run on December 5, 2006, plaintiff's failure-to-accommodate claim under the ADA is viable only if she filed her charge of discrimination with the EEOC by October 1, 2007.[13]  Def.'s Mot. for Summ. J. at 22.  Review of the charge, however, reveals that it was not filed until October 19, 2007.  See id., Ex. M at 1.

Minter counters that she filed a charge of discrimination on December 1, 2006, and therefore, it was timely filed with the EEOC within 300 days, that is, by October 1, 2007.  See generally Pl.'s Opp'n at 17–21.  She relies on Fed. Express Corp. v. Holowecki, 552 U.S. 389 (2008), to support her argument that she "lodged her charge of discrimination on December 1, 2006, through her EEOC intake questionnaire, which itself constitutes a 'charge of discrimination,'" Pl.'s Opp'n at 17–18.  The Intake Questionnaire, she contends, "detail[s] discrimination occurring in September, November, and December of 2006," and therefore, any "[d]iscriminatory acts occurring thereafter are thus properly part of [her] claim."  Id. at 19.  That she filed her actual "Charge of Discrimination" on October 19, 2007, she argues, is not dispositive.  Id.

The Supreme Court considered in Holowecki whether an "Intake Questionnaire" constitutes a "charge" for purposes of the Age Discrimination in Employment Act ("ADEA"), see 29 U.S.C. § 621 et seq.  While mindful of the admonition that "employees and their counsel must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination," Holowecki, 552 U.S. at 393, the Court concludes that the Supreme Court's analysis in Holowecki also applies in the context of an ADA claim.  See, e.g., Beckham v. National R.R. Passenger Corp., 590 F. Supp. 2d 82, 86 (D.D.C. 2008) (applying

---

[13]   The Court presumes a typographical error in the District's memorandum identifying the operative date as December 5, 2007, see Def.'s Mem. at 22, and proceeds as if the operative date is December 5, 2006.

Holowecki in the context of race discrimination and retaliation claims under Title VII of the Civil Rights Act "because of the similarities between the statutory schemes of the ADEA and Title VII concerning exhaustion of administrative remedies").

In Holowecki, the claimant submitted to the EEOC an Intake Questionnaire (Form 283) and "attached to the questionnaire a signed affidavit describing the alleged discriminatory practices in greater detail." 552 U.S. at 394. Even though the questionnaire complied with certain minimum requirements set forth by regulation, see 29 C.F.R. §§ 1626.6 and 1626.8, the Supreme Court "accept[ed] the agency's position that the regulations do not identify all necessary components of a charge; and it follows that a document meeting the requirements of [the regulations] is not a charge in every instance." Holowecki, 552 U.S. at 397. Where, however, a document not only meets the minimal requirements set forth by regulation but also can be "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise to settle a dispute between the employer and the employee," id. at 402, it qualifies as a charge of discrimination. And "[t]he filing of a charge . . . determines when the [ADEA's] time limits and procedural mechanisms commence." Id. at 404. In Holowecki, the intake questionnaire and supporting affidavit read together were found to be a request for agency action "to activate its machinery and remedial processes," id. at 402, particularly because "the completed questionnaire . . . was supplemented with a detailed six-page Affidavit" in which the complainant "asked the agency to '[p]lease force Federal Express to end their age discrimination,'" a statement "properly construed as a request for the agency to act." Id. at 405.

Despite certain technical deficiencies, the Court finds that Minter's Intake Questionnaire substantially complies with the minimum regulatory requirements. See 29 C.F.R. § 1601.12(b).

The Questionnaire does not, however, communicate an intention "to activate the [ADA's] machinery," as required by Holowecki.  The document is plainly titled – in large print – "Intake Questionnaire."  Nowhere on the face of the questionnaire does it state that it alone is or would be deemed a charge of discrimination.  Consistent with the disclosure statement on its final page, the principal purpose of the questionnaire is to provide "information . . . relevant to filing a charge of discrimination," so the EEOC can "make an official determination whether facts exist to prepare a charge of discrimination."  Def.'s Mot. for Summ. J., Ex. K at 5. The questionnaire does not, for example, include a box for a claimant to check stating, "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I describe above," as in Leftwich v. Gallaudet Univ., 878 F. Supp. 2d 81, 91–92 (D.D.C. 2012).  It also does not indicate that it would be considered a charge of discrimination if no other timely documents were filed. See Tucker v. Howard Univ. Hosp., 764 F. Supp. 2d 1, 7–8 (D.D.C. 2011); Hodge v. United Airlines, 666 F. Supp. 2d 14, 20–21 (D.D.C. 2009); Beckham, 590 F. Supp. 2d at 87 (finding a submission titled "Charge Questionnaire" to be sufficient where the form clearly stated that, without further timely filings, the form itself would constitute a charge).

Minter did not attach a letter or separate document to the questionnaire expressing her intention to file a claim.  She merely added a handwritten notation expressing her "wish to *consult* with a[n] EEO Specialist regarding the *possible* filing of charges."  Def.'s Mot. for Summ. J., Ex. K at 4 (emphasis added).  This is hardly a clear and forceful demand for agency action.  Other courts in this district have found similar information provided on an intake form to be insufficient to constitute an EEOC charge.  See Featherston v. District of Columbia, 910 F. Supp. 2d 1, 5–7 (D.D.C. 2012) ("Considering . . . the lack of an explicit request that the EEOC take remedial action for such discrimination, and the lack of textual indication in the intake

questionnaire that the EEOC would take such action without a formal charge subsequently being filed . . . the intake questionnaire in this case does not constitute the charge."); Marshall v. Honeywell Technology Solutions, Inc., 598 F. Supp. 2d 57, 62 (D.D.C. 2009) (finding that merely providing an allegation of discrimination and the name of employer on an intake form does not constitute a charge under Holowecki). Even assuming, *arguendo*, that Minter was confused about the nature of the Intake Questionnaire, her receipt of correspondence from the EEOC in April 2007, enclosing copies of the charge of discrimination and directing her to sign and return them in order for the EEOC to take any further action should have clarified matters. Def.'s Mot. for Summ. J., Ex. L. The Court concludes that Minter's Intake Questionnaire does not manifest an intent to file a charge of discrimination, and Minter cannot rely on the date of its filing, December 1, 2006, to establish that her ADA charge of discrimination was timely filed within the 300-day limitations period. Accordingly, the Court will grant summary judgment to the District on Minter's failure-to-accommodate claim (Counts I and II) under the ADA.

ii. Failure-to-Accommodate Claim Under the Rehabilitation Act

The District argues that Minter's failure-to-accommodate claim under the Rehabilitation Act (Count IV) is barred because she failed to file this lawsuit within the requisite three-year limitations period. Def.'s Mot. for Summ. J. at 24. Under this view, because plaintiff's claim arose no later than December 5, 2006, the filing of this lawsuit on March 22, 2010, is untimely. See id. The parties do not dispute that a three-year limitations period applies to a claim under the Rehabilitation Act. See Gordon v. District of Columbia, 605 F. Supp. 2d 239, 245 (D.D.C. 2009) (holding that the District's three-year limitations period for personal injury claims applies to Rehabilitation Act claims); Long v. Howard Univ., 512 F. Supp. 2d 1, 12 (D.D.C. 2007) (holding that three-year period applies to claims under Rehabilitation Act and ADA), aff'd, 550

F.3d 21 (D.C. Cir. 2008). Nonetheless, Minter counters that she was required to administratively exhaust her Rehabilitation Act claim, and "[b]ecause [she] did not receive her right to sue letter [from the EEOC] until December 22, 2009, her . . . claims are timely under the Rehabilitation Act." Pl.'s Opp'n at 23.

As Minter acknowledges, however, whether administrative exhaustion is required "prior to commencing suit under § 794 remains an unsettled question in this jurisdiction," Adams v. D.C., 740 F. Supp. 2d 173, 181 (D.D.C. 2010). To be sure, Minter is correct that several courts in this district have held that plaintiffs must exhaust administrative remedies before filing a suit under the Rehabilitation Act. See, e.g., Ellis v. Georgetown Univ. Hosp., 631 F.Supp.2d 71, 75 (D.D.C. 2009) (plaintiffs suing a non-federal employer under § 794 of Rehabilitation Act, "like those under Title VII, must exhaust their administrative remedies"). Yet, the Court finds that Adams, 740 F. Supp. 2d 173, embodies the more persuasive interpretation of the Rehabilitation Act's remedy requirements. In Adams, the Court comprehensively reviewed the conflicting cases in this district concerning this issue, and, based on the text and structure of the 1992 amendments to Section 794 of the Rehabilitation Act, Pub. L. No. 102–569, 106 Stat. 4344, concluded that the ADA's exhaustion requirement does not apply to Rehabilitation Act claims. Id. at 181–82. Specifically, the Court in Adams noted that the 1992 amendments provided that the ""[t]he standards used to determine whether [Section 794] has been violated in a complaint ... shall be the standards applied under title I of the [ADA]." 740 F. Supp. 2d at 181. While "[s]ome courts have interpreted the 'standards' of the ADA to include the 'powers, remedies, and procedures' that the ADA incorporates from Title VII, including Title VII's requirement that a plaintiff exhaust his or her administrative remedies," others have "reasoned that had Congress intended to amend the Rehabilitation Act so as to incorporate the 'powers, remedies, and

procedures' of the ADA, it would have done so expressly." Id. at 181–82. The latter cases contend that "Congress was simply ensuring that all employees governed by federal disability anti-discrimination law were subjected to the same liability requirements," Stewart, 2006 WL 626921 at *10, and emphasize "the fact that the Rehabilitation Act explicitly incorporates Title VI's 'remedies, procedures, and rights' into § 794, rather than those of Title VII," Adams, 740 F. Supp. 2d at 182. This Court agrees, and holds that "the ADA's exhaustion requirement does not apply to the Rehabilitation Act[.]" Id. While the D.C. Circuit has not addressed the issue since the 1992 amendments, every other Circuit to confront it has held likewise. Id. at 182 n. 8 (citing Freed v. Conso. Rail Corp., 201 F.3d 188, 192 (3d Cir.2000) (collecting cases)).

Further, the limitations period in the employment discrimination context does not toll when a plaintiff chooses, but is not required, to exhaust her administrative remedies before initiating a lawsuit, as Minter did here. See Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 461 (1975); Adams, 740 F. Supp. 2d at 182 (collecting cases). Consequently, because Minter did not file her Rehabilitation Act claim within the three-year limitations period, the Court finds that it was time-barred.

### iii. Failure-to-Accommodate Claim Alleging the District Failed to Fulfill Its Role in the Interactive Process

The District also moves for summary judgment on plaintiff's failure to accommodate claims because, it contends, no reasonable jury could find that the government did not fulfill its role in the interactive process. See generally Def.'s Mot. for Summ. J. at 27–36. Minter counters, see generally Pl.'s Opp'n at 24–30, that there remain disputed issues of material fact as to its compliance.

The interactive process solely requires "that employers make a good-faith effort to seek accommodations." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317 (3d Cir. 1999). As

courts in this district have noted, "[e]mployers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome."  Woodruff v. LaHood, 777 F. Supp. 2d 33, 41–42 (D.D.C. 2011) (quoting Taylor, 184 F.3d at 317).  The District appears to have taken many – if not all – of these steps, and Minter fails to cite any binding authority explaining why its actions did not constitute good faith under Woodruff.  Consequently, this Court finds that no reasonable jury could find that the District did not fulfill its role in the interactive process.

> ### B.  Whether Plaintiff Is a "Qualified Individual with a Disability"

In the alternative, the District argues that plaintiff's failure to accommodate claims under Titles I and II of the ADA (Counts I and II) and under the Rehabilitation Act (Count IV) must fail because plaintiff is not a "qualified individual" whose disability must be accommodated.  See generally Def.'s Mot. for Summ. J. at 36–37.  The standard applied to each claim is the same:

> In order to make out a prima facie case, a plaintiff must show: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that *with reasonable accommodation she could perform the essential functions of the position*; and (4) that the employer refused to make such accommodations.

Gordon v. District of Columbia, 480 F. Supp. 2d 112, 115 (D.D.C. 2007) (citations omitted) (emphasis added).  The parties do not dispute that plaintiff has a disability, which for purposes of this discussion is defined as:

(A) a physical or mental impairment that substantially limits one or more *major life activities* of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1) (emphasis added); <u>see</u> 29 U.S.C. § 705(9)(B).[14]  Major life activities include walking, standing, lifting, bending and working.  42 U.S.C. §12102(2)(A).  A "reasonable accommodation" includes "making existing facilities used by employees readily accessible to and usable by individuals with disabilities[, and] job restructuring, part-time or modified work schedules."  42 U.S.C. § 12111(9).

Generally, Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation . . . , and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  For purposes of Title I, a "qualified individual" means "an individual who, with or without reasonable accommodation, can *perform the essential functions of the employment position that such individual holds* or desires."  42 U.S.C. § 12111(8) (emphasis added).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §12132.  The term "qualified individual with a disability" means:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, *meets the essential*

---

[14]  Minter's termination occurred before the ADA Amendments Act of 2008 became effective on January 1, 2009, and the amendments therefore do not apply retroactively in this case.  <u>See</u> <u>Lyles v. D.C. Water and Sewer Auth.</u>, 572 F.3d 936, 942 (D.C. Cir. 2009).

> *eligibility requirements for the receipt of services or the participation in programs or activities* provided by a public entity.

42 U.S.C. § 12131(2) (emphasis added).

The District argues that, based on Dr. Batipps' Disability Certificate, Minter is not a qualified individual because her total disability for an indefinite duration prevented her from either performing essential functions of her position as CFRC Coordinator or meeting essential eligibility requirements for government services or programs, with or without a reasonable accommodation. Because of her total disability "for an indefinite period of time, she cannot now contend that she was a 'qualified individual,'" and therefore, "her claims for failure to accommodate must be dismissed." Def.'s Mot. for Summ. J. at 37.

Minter responds with two arguments. First, she asserts that Dr. Batipps' Disability Certificate "is not directly relevant to [her] disability under the ADA, as it is written using Social Security Disability Income benefits terminology that carries a different meaning." Pl.'s Opp'n at 30. It is plaintiff's burden to address any discrepancy between a disability for purposes of ADA (meaning that she can still function with or without reasonable accommodation) and a disability for purposes of Social Security disability benefits. See Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 807 (1999). In denying the District's motion to dismiss, the Court explicitly gave Minter "the opportunity to do so in this case." Mem. Op. at 11 (Mar. 9, 2012). In the face of Dr. Batipps' Disability Certificate, Minter must proffer "an explanation of any apparent inconsistency with the necessary elements of an ADA claim," and "[t]o defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." Cleveland., 526 U.S. at 807. (internal quotation marks omitted); see Solomon

v. Vilsack, 628 F.3d 555, 562 (D.C. Cir. 2010) (finding that, "[s]ince a reasonable jury could find that [employee's] statements in support of her [application for disability benefits] are consistent with her current contention that she could have worked . . . if afforded reasonable accommodations, neither her accommodation claim nor her retaliation claims are foreclosed"). Because Minter fails to offer an alternative interpretation of the Disability Certificate, she fails to meet her burden on summary judgment.

Second, Minter contends that she has produced "uncontroverted evidence that disputes the District's position that she was able to perform the position while on loan to the OCME with an accommodation." Pl.'s Opp'n at 30. This evidence principally is deposition testimony regarding plaintiff's performance in positions held years before she became the CFRC Coordinator. Missing from plaintiff's submission is any discussion or credible explanation that her ability to perform, for example, as a Program Specialist while detailed to OCME in 1999 and 2001 while working a reduced work schedule demonstrates her ability to perform as the full-time CFRC Coordinator from May 1, 2006 forward.

Further, Minter's experts shed little additional light on the connection between a reduced 32-hour per week schedule and plaintiff's ability to perform her duties as CFRC Coordinator at all. A neurologist merely suggested that patients with symptoms like plaintiff's "can benefit from workplace accommodations, especially during disease exacerbations," but does not describe what those accommodations might be for such patients in general or for Minter in particular. Pl.'s Opp'n Ex. 5 at 6. A vocational expert concluded that "working one to two days at home per week or a flexible work schedule" are reasonable accommodations, but does not explain why these accommodations would enable Minter specifically to perform her duties. Pl.'s Opp'n Ex. 6 at 6. In fact, Minter has provided no deposition testimony or any other evidence

linking her diagnoses and symptoms to her ability or inability to perform her duties. For example, if plaintiff's ability to sit, stand and walk is limited, nothing in the record explains how much sitting, standing and walking would be required of her, or how the accommodations she requested address or otherwise alleviate her symptoms. All that *is* on the record is Dr. Batipps' Disability Certificate, which suggests that Minter is totally disabled for an indefinite period. Her position description includes tasks such as supervising, training and evaluating staff; managing the day-to-day activities of the CFRC; and attending team meetings and other relevant D.C. government "internal reviews[,]" Def.'s Mot. for Summ. J., Ex. C at 2–3, but Minter has not provided evidence of how she could fulfill these duties "with or without reasonable accommodation" as required under the ADA, 42 U.S.C. § 12111(8), if she was totally disabled for an indefinite period. Thus, the Court finds that no reasonable jury could find that Minter is a qualified individual with a disability under Titles I and II of the ADA.

## C. Plaintiff's Retaliation Claims

The District also moves for summary judgment on plaintiff's retaliation claims under the ADA, the Rehabilitation Act, and the DCHRA. <u>See generally</u> Def.'s Mot. for Summ. J. at 37–42. Because the District puts forth an explanation for its decision to terminate plaintiff, the analysis proceeds as follows:

> [I]f an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action, the district court must conduct one central inquiry in considering an employer's motion for summary judgment or judgment as a matter of law: whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.

<u>Adeyemi v. District of Columbia</u>, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (citation omitted).

According to the District, it had a legitimate, nondiscriminatory reason for firing Minter: she effectively abandoned her job. See Def.'s Mot. for Summ. J. at 40. She stopped coming to work after February 28, 2007 and by April 28, 2007, she had used all of her sick leave, annual leave, and leave authorized in connection with her worker's compensation claim. Notwithstanding OCME's many requests, Minter supplied no medical documentation to justify her extended absence until she produced Dr. Batipps' Disability Certificate declaring her totally disabled for an indefinite period beginning September 26, 2006. Minter counters there is a plausible alternative explanation for her termination: the *content* of the medical documentation she ultimately provided. See Pl.'s Opp'n at 35. According to Minter, the fact that the District made the decision to terminate only after receiving medical documentation confirming her disability, Def.'s Mot. for Summ. J. at 41, proves that the content of the documentation motivated her termination. Pl.'s Opp'n at 35–36.

Minter's evidence does not show that the District's stated motivation was pretextual and actually buttresses the reason for termination asserted by the District. The District claims Minter was fired for failing to show up for work, and the content of the medical documentation Minter provided bolstered that conclusion, as it stated that she would be absent indefinitely. Id. While Minter has sought to permission to work from home or to work reduced hours at various times, the medical documentation she provided indicated that she would not be able to perform her work functions at all for an indefinite period. Termination due to a general inability to perform is not retaliation, as the standard for failure-to-accommodate specifically requires a plaintiff to show "that with reasonable accommodation she could perform the essential functions of the position[.]" Gordon v. District of Columbia, 480 F. Supp. 2d 112, 115 (D.D.C. 2007). In a similar disability discrimination case, the D.C. Circuit observed that "an essential function of any

government job is an ability to appear for work" and affirmed the proposition that government entities are not required to retain employees who cannot do so. *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994). In other words, as in this case, "what Plaintiff [is] seeking [is] an indefinite leave period, something an employer is not required to grant[.]" <u>Sampson v. Citibank, F.S.B.</u>, 53 F. Supp. 2d 13, 18 (D.D.C. 1999) aff'd, 221 F.3d 196 (D.C. Cir. 2000). In short, Minter's argument does not constitute adequate evidence under the <u>Adeyemi</u> standard that a reasonable jury could find that the District's purported legitimate, nondiscriminatory reason for termination was not the actual reason for its decision. The Court therefore will grant summary judgment on Minter's retaliation claims.

Accordingly, it is hereby

**ORDERED** that the District of Columbia's motion for summary judgment is **GRANTED**.

**SO ORDERED.**


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: _____August 5, 2014_____